IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 20, 2016 Session

## STATE OF TENNESSEE v. MICHAEL DEAN SEXTON

**Appeal from the Criminal Court for Scott County**
**No. 10113A  E. Shayne Sexton, Judge**

_____

### No. E2016-01296-CCA-R3-CD

_____

Defendant, Michael Dean Sexton, was convicted of one count of theft over $10,000 and one count of vandalism over $10,000.  He received concurrent sentences of nine years for each count to be served on supervised probation.  On appeal, Defendant raises the following issues: (1) Whether the trial court properly discharged a juror (Defendant's Issues I and II); (2)  Whether the State was required to make an election of offenses and whether the trial court properly declined to issue a jury instruction (Defendant's Issues III and IV); and (3) Whether the trial court erred by permitting the name of the co-defendant to be redacted from the indictment and whether the trial court refused to allow Defendant to introduce a copy of the unredacted indictment into evidence.  (Defendant's Issues V and VI).  After a thorough review of the record, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined.  NORMA MCGEE OGLE, J., concurs in results only.

David A. Stuart, Clinton, Tennessee, for the appellant, Michael Dean Sexton.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Jared Ralph Effler, District Attorney General; and David Michael Pollard, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Background

### State's Proof

Jim Reed is a "registered land surveyor" with the State of Tennessee and has been registered as such since 1981. He does mostly boundary surveys and a few commercial surveys. Mr. Reed estimated that he has conducted "several thousand" surveys since 1981.

Mr. Reed testified that he was familiar with Denzil Stephens' residence located on Buffalo Creek Road, and he completed the original survey of the property in 2003 for Ayers Real Estate when Mr. Stephens purchased the property. Mr. Reed testified that Mr. Stephens' property had a total of thirty acres with timber and "bottom land." Buffalo Creek also runs through the property. Mr. Reed testified that on May 14, 2010, he also surveyed a tract of the "Virgie Babb" (Babb) property, located next to Mr. Stephens' property. The survey was recorded in the Register of Deeds Office. Mr. Reed testified that that particular tract of the Babb property consisted of 109.5 acres, most of which was timber. He said that Mr. Stephens lived in a mobile home near the property line. Mr. Reed testified in detail concerning the boundary line between the two properties. He noted that there was a red painted boundary line that had been painted by the Babb family, and some of the trees near the line had been painted to identify the line. Mr. Reed also placed red caps on the boundary pins that he used to mark Mr. Stephens' property line in 2003.

Mr. Reed testified that he was later contacted by the Babb family for a third partial survey of the property line. He resurveyed the common line between the Stephens and Babb property in January or February of 2012. Mr. Reed found that one of his survey pins had been "bulldozed out." Also, a "20-inch" popular tree that had been previously painted red and identified as a boundary marker had been cut and removed.

Denzil Stephens testified that he met Defendant when Defendant came to his house asking to cut timber on Mr. Stephens' property. He said that Defendant approached him several more times about cutting the timber, and Mr. Stephens finally agreed. Mr. Stephens testified that Cecil Babb walked the property line with Defendant, and Mr. Stephens walked around with them a "little bit." Shannon Chitwood was also present. Mr. Stephens said that he gave Defendant a map to use, and Defendant told him that white oak trees were the most valuable. He was present when Mr. Babb instructed Defendant to stay on the right or "westerly" side of the branch that separated the properties when cutting timber. He said that Mr. Babb was in the area almost every day. Mr. Stephens testified that Defendant once told him to "run Babb off because he was – he was afraid that he would - - a tree would fall on him or something, that I had to run him

off." He said that Defendant stopped cutting timber when Mr. Babb told Mr. Stephens that Defendant was cutting all of the white oak trees on the Babb property. Mr. Stephens testified that Defendant immediately left without cleaning "all the mess up, and the branch[es], it was supposed to be cleaned out and all that."

Cecil Babb testified that he lives on Buffalo Creek Road in Oneida. Virgie Babb was his mother and is now deceased. Mr. Babb testified that after his mother's death, he and his two sisters hired Jim Reed to survey her property for the purpose of dividing up the estate. Mr. Babb's sister, Judy Babb Garner, was the executor of the estate and had control of the property when Defendant began logging. In November 2011, Ms. Garner became the sole owner of the land. Mr. Babb testified that Defendant called him in 2011 and asked if Ms. Garner wanted the timber cut on the property. He said that Defendant mentioned a white oak tree that he had looked at. Mr. Babb then placed a call to his sister. Mr. Babb testified that he did not give Defendant permission to cut logs on the property. He was aware that Defendant had permission to cut logs on Mr. Stephens' property. Mr. Babb testified that he later told Defendant face-to-face that his sister did not want any logging done on the property. Mr. Babb testified that he told Defendant at least two times where the property line was located, and he had also told Defendant that he was getting near the property line.

Mr. Babb testified that he walked up to the area where Defendant was logging a few times, and he looked for the property line. Defendant again mentioned the white oak tree and said that there was some nice timber on the property. Mr. Babb said, "I went up there with them for awhile, but I – we never did find any markers. We never did find the point. That wasn't the point anyway. It was above that." When asked if Mr. Babb told Defendant to stay on the right side of a stream that ran between the properties, Mr. Babb testified:

> Well, the property marker at the end of his yard there where it was originally surveyed was missing; the property marker wasn't there. And that's where they claim they found the iron bar by the locust post over there and went over there and went up through that. And Shannon Chitwood - - I went up there on[e] day, and he took me over there and showed me there was a locust post with a bar by it. And so, I - - there was no markings up through there anywhere. I couldn't' see any other markings, and I - - so I did give him a benefit of a doubt on that. At that time, they were across the property line definitely, because the property line runs right up the branch right in front of - - right at the edge of his yard there. That's where it was surveyed.

Mr. Babb testified that he saw Defendant, his employees, and equipment on the Babb property. He said,

Well, I seen them dragging the logs in and out. I seen them with their equipment over there, and they were over there cutting trees. I could hear the power saws and see the dozer dragging the trees out after they sawed the limbs off of them.

Mr. Babb testified that he never confronted Defendant because he was not present "about the last week or week and a half [Defendant] was up there. . ." He thought that Defendant was going to "go up where he said the iron bar was by the locust post and cut a little ways up there, then I thought they were gonna leave." When Mr. Babb later returned to the Babb property and discovered that Defendant had expanded his logging operations onto the Babb property, Mr. Babb contacted Mr. Reed about having the property resurveyed to make certain of the property line. Mr. Babb said that a bull dozier had been over the Babb property line, and the property had been "devastated." He called Ms. Garner to let her know what happened.

Judy Babb Garner testified that she did not give Defendant permission to cut timber on the property. She said that she was asked about logging on the property, and her response was "no." On January 11, 2012, Ms. Garner received a voice mail from Mr. Babb, who sounded "distressed" because Defendant had cut a "stand of timber" on her property. Ms. Garner called Defendant and told him that he was cutting timber on her property and that he was not to cut any further. Defendant then indicated that he did not know it was her property. Ms. Garner and her husband, Charles, drove to the property the following weekend and took pictures of the area. She said that there were "heaps of trash there, and a big - - a bull dozer had come in and cut down a road down the side of the mountain and stumps, you know." She thought that Defendant left the area the following day.

Investigator Shayne Ratliff of the Tennessee Department of Agriculture, Crime Unit, testified that he investigated the timber theft on the Babb property. He was contacted by Mrs. Garner in March 2012, and she told him what had occurred on her property. Investigator Ratliff advised her to file a police report, which she did in April 2012. On May 1, 2012, Investigator Ratliff met Mrs. Garner and her husband at the property, and they walked the property line, which had been recently surveyed. He could see both the old and new boundary markers. Investigator Ratliff looked at the recent survey prepared by Mr. Reed, and he also took a statement from Cecil Babb and Mr. Stephens. On May 31, 2012, Investigator Ratliff took a written statement from Defendant, and Defendant said that Mr. Stephens walked the property line with him. Investigator Ratliff testified that Mr. Stephens showed him one of the survey pins on the property during his interview of Mr. Stephens. He said that it was located approximately twenty yards from Mr. Stephens' front door. Investigator Ratliff then turned his findings over to the District Attorney General. He was aware that the case against Mr. Stephens was dismissed.

On cross-examination, Investigator Ratliff agreed that he testified to the Grand Jury and requested that Defendant and Mr. Stephens both be charged with theft of property and vandalism. The grand Jury then returned an indictment against both men. Investigator Ratliff testified that he initially intended to charge only Defendant but added Mr. Stephens after speaking to the District Attorney General. He was aware that Attorney Howard Ellis had written a letter on behalf of Mrs. Garner with a sentence that read, "[I]t is well established that [Defendant] cut the timber at the direction of Mr. Stephens." Investigator Ratliff did not know if that was why Mr. Stephens was also charged.

Investigator Ratliff testified that Defendant told him that he did not knowingly cut any timber from the Babb property and that the only timber he cut was from Mr. Stephens' property. Investigator Ratliff could not say for certain if Defendant cut any trees on the Babb property before or after November 11, 2011, because Investigator Ratliff was not there. However, it was clear to him that some logging had been done on the Babb property.

Neal Owens was employed by American Forest Management at the time of the offenses in this case. The company prepared a damage appraisal report for Mrs. Garner in February 2012. Mr. Owens went to the Babb property and used a handheld GPS device to map the area where timber had been cut. He testified that they counted each stump, and there were a total of 394 "hardwood" trees and 267 "pulpwood" trees cut down and removed.

Jake Almond is a regional forester and co-owner and vice-president of American Forest Management. He was qualified as an expert in timber valuation. Mr. Almond prepared a damage appraisal for Mrs. Garner, and he determined that the value of the timber taken from the Babb property was $12,856.00.

*Defendant's Proof*

Shannon Chitwood testified that he and Defendant are friends, and he previously worked for Defendant for approximately two years. He was working for Defendant from the fall of 2011 through January 2012 when the present offenses took place. Mr. Chitwood testified that he told Cecil Babb that Mr. Stephens had found a survey pin, and he and Mr. Babb walked over to the pin, and Mr. Babb tied a string around it. The pin was beside a locust pole near the "branch." Mr. Chitwood also noted that the pin was covered in soil when Mr. Stephens found it. He said that Mr. Babb told him "long as we stay on this side of the branch, we'd be fine." Mr. Chitwood testified that neither he nor Defendant crossed over onto the Babb property while logging. He testified that Mr. Babb came to the property "every other day." He never heard Mr. Babb say that they were on the Babb property. Mr. Chitwood testified that the last property marker between the

Babb property and Mr. Stephens' property was a metal pipe. He also recalled seeing a couple of trees with red paint on them.

On cross-examination, Mr. Chitwood did not recall Defendant calling Mr. Babb and asking for permission to log the property. He also said that Mr. Babb did not tell Defendant that Mr. Babb would have to ask Mrs. Garner for permission to log the property. Mr. Chitwood testified that he obtained a survey and map of Mr. Stephens' property from the Register of Deeds' office before he began logging. He said that he never crossed the branch with the bulldozer. However, Mr. Chitwood admitted that he cut a road with the dozer. He denied cutting a tree with red paint on it or finding any other property markers listed on the survey. Mr. Chitwood testified that Mr. Stephens never told him that he could cross the branch where the survey pin was found.

**Analysis**

> I.      *Whether the Trial Court Properly Discharged a Juror (Defendant's Issues I and II).*

Defendant contends that the trial court erred by dismissing a juror before deliberations without randomly selecting one of the thirteen impaneled jurors as an alternate. He further argues that the trial court committed reversible error "when it decided to excuse one of the 13 trial jurors based upon unsworn *ex parte* communications between the juror and the bailiff and a court officer."

Once a jury is impaneled, jurors may be discharged from further service prior to deliberations only if found by the trial court to be "unable or disqualified to perform their duties." Tenn. R. Crim. P. 24(f); *see* T.C.A. § 22-5-312. The decision to discharge a juror is left to the discretion of the trial judge. *State v. Millbrooks*, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991). The defendant has the burden of showing prejudice by the trial court's seating of an alternate juror. *State v. Max*, 714 S.W.2d 289, 294. The defendant has a right to a fair trial at the hands of an impartial jury, but such a right does not include the right to any particular jurors. *See State v. Smith*, 857 S.W.2d 1, 20 (Tenn. 1993).

We note that technically, the trial court did not excuse a juror tentatively designated to deliberate at the conclusion of the proof and substitute a juror tentatively designated as an alternate juror. The jury was comprised of thirteen members throughout the trial until just before deliberations, when the "alternate" would have been selected by random draw and immediately excused. Tenn. R. Crim. P. 24(f)(2)(A). The purpose in starting a trial with more than twelve persons in the jury "box" is to enable the trial to continue to the deliberations stage in the event a juror can no longer serve due to a situation that arises during the trial. If the excused juror's problem had arisen in the middle of the proof, we conclude it would be highly unlikely that there would have been

any discussion about having a random draw at that point to choose an "alternate" juror and hope that the alternate picked would be the juror who must be excused for cause.

Tennessee Rule of Criminal Procedure 24(d) provides:

(d) Exercising Peremptory Challenge. After the court conducts its initial examination and seats a tentative group of jurors not excluded for cause, the following procedure shall be followed until a full jury has been selected from those jurors and accepted by counsel:

(1) At each round of peremptory challenges, counsel shall submit simultaneously to the court either a blank sheet of paper or a sheet of paper challenging one or more jurors in the group of the first twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) jurors who have been seated. Neither party shall make known the fact that the party has not challenged a juror.

(2) Replacement jurors will be seated in the panel of twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) in the order of their selection.

(3) If necessary, additional replacement jurors will be examined for cause and, after passed, counsel will again submit simultaneously, and in writing, the name of any juror in the group of twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) that counsel elects to challenge peremptorily. Peremptory challenges may be directed to any member of the jury; counsel are not limited to using such challenges against replacement jurors.

(4) Alternate jurors are selected in the same manner, unless the single entity process of Rule 24(f)(2)(A) is used.

(5) The trial judge shall keep a list of those challenged. If the same juror is challenged by both parties, each party is charged with the challenge. The trial judge shall not disclose to any juror the identity of the party challenging the juror.

Tenn. R. Crim. P. 24(d).

It appears that the trial court in this case used the "single entity process" of Rule 24 which provides:

> (A) Single Entity. During jury selection and trial of the case, the court shall make no distinction as to which jurors are additional jurors and which jurors are regular jurors. Before the jury retires to consider its verdict, the court shall select by lot the names of the requisite number of jurors to reduce the jury to a body of twelve or such other number as the law provides. A juror who is not selected to be a member of the deliberating jury shall be discharged when that jury retires to consider its verdict.

Tenn. R. Crim. P. 24(f)(2)(A). This rule "gives the court the option of using a procedure that eliminates the distinction between regular and alternate jurors"; should "a regular juror become[] unable to serve, the additional juror is combined with the other jurors for all purposes during the trial." Additionally, "before the jury retires to deliberate the court will randomly deselect the additional jurors, leaving the desired number of jurors, ordinarily twelve." Tenn. R. Crim. P. 24 Advisory Comm'n Cmts.

In this case, thirteen jurors were selected to hear Defendant's case. However, prior to deliberations, the trial court informed Defendant and the State that it could not allow the jury to deliberate after lunch because of a prior obligation in another county. Therefore, the trial had to be extended another day. A juror then told the court officer that his wife had a medical issue that would not allow him to attend court the next day. The following proceedings took place outside of the jury's presence.

> THE COURT: All right. Let the record show that the jury has left the room, and we are at the - - we're at the portion of the trial where the jury is about to get the case. We still have our alternate in place. Information was brought to me through Mike Wilson and then through Nikea Murphy that one of our jurors has an irreconcilable conflict tomorrow. His name is [        ]. I've heard nothing else from anyone else, and I am asking the parties how they feel about the Court just naming him the alternate. And I - - I'm troubled by it. I don't - - I don't want to get into the - - into where we are. It's always a random draw but knowing that this gentleman will not be here tomorrow anyway, we would be in a situation where we were aborting the case, or we would have to go get him. That - - it it - - it was [    ]; is that correct?

> BAILIFF: I think so, your Honor.

       *     *     *

THE COURT:    Well, I just - - I did not want to – I wanted to disclose this to the parties and see what they thought.  We can make it random and take our chances, or the parties can – if you want to agree.  I'll leave that to you, take a moment and think about it.

[DEFENSE COUNSEL]: Your Honor, is there any precedent for an alternate being selected intentionally other than at random?

THE COURT:    If the parties agree, there's not a problem.  I mean, the 13 - - we have - - 13 jurors have been duly selected.  Everyone ostensibly is satisfied with them.  They were not excluded.  Challenges were remaining.  I mean every - -you were basically happy with the 13 there.  And you know, there is always the chance that he'd have been taken random.  I'm simply saying that if we agree to let him go, the remaining 12 will try this case, or if you agree to let him go.  If it's up to me, it's gonna be random, and then we're at the mercy of the draw.  And all the work - - you know, I - - we can send for him.  I think that a reticent juror, I'm not sure is the type of juror we need in here at the time.  But, this is unique.  This trial had gone longer than we expected.  And also, I have an irreconcilable conflict myself today that just can't - - I can't sit with this to let it finish.  I'm confi[dent] I think they would have a verdict today, I think.  However, they've got a lot of exhibits.  This is a - - you know, there are very big issues here.  So I'm asking the parties if they are willing to agree.  If you aren't we'll put him back in the pile and we'll just draw.

[DEFENSE COUNSEL]: You will be selecting the alternate immediately prior to starting to deliberate right?

THE COURT:    The minute - - we're about to hand the instructions to the jury.  Before they get that packet, we'll take that one out.  So the 12 deliberating jurors are the only ones that are subject to receiving the instructions.  So, after - - the next step is to select this alternate.

[DEFENSE COUNSEL]: I've been waiting to get my religious faith restored, your Honor, and I was thinking maybe what you should do is just go ahead and pick and maybe it will be him.

THE COURT:    Well, that's - - I mean, that's where we're at.

- 9 -

[DEFENSE COUNSEL]: I mean, if it's not him, we could still agree, could we not?

THE COURT: We wouldn't have anyone to agree on. I mean, it - -

[DEFENSE COUNSEL]: Well, I mean, could you not pick and tell use before you tell them and if it - - I mean, I don't know. I'm just - -

THE COURT: That takes the randomness out of it, though. I mean, if we're gonna agree, let's agree up front.

\* \* \*

[PROSECUTOR]: Your Honor, from the - - the State's position is, we selected 13 jurors. I would rather agree on eliminating the juror with the irreconcilable conflict than take a chance on blowing this out of the water and potential mistrial.

THE COURT: That is a real possible outcome. It is a possible outcome, and that's what I'm - - I'm trying to - - if there is an agreement, then this is not a legal issue, and I think there is a way to explain this from a legal standpoint. The 13 jurors were satisfactory at the beginning of the trial. This one, nor anyone else was excluded. You know, you had - - everyone had challenges remaining. This is simply a - - if he didn't show tomorrow, let's take - - let's take it and show – do it like tomorrow. Leave him in the box. He doesn't show tomorrow, then we would just continue with the 12 remaining. However, we've gotten up to the point where, you know, it's time to pick one. If I waited to tomorrow to pick one, and he, for whatever reason, didn't show up, then the solution is there. However, then I'd have to deal with, you know, the potential contempt. That's not a precedent that you want to set for a sitting jury. I'm simply saying that by agree - - if the parties agree, then there is no problem. If the parties do not agree, then there is no problem. If the parties do not agree, then I will just do it the way we normally do it. I mean, I'm, - - but I will not - - I will not overbear either side in this case. You all want to talk a minute? Do you have anything you want to talk about?

[DEFENSE COUNSEL]: Your Honor, I'm afraid we can't agree. I'll save [the prosecutor] from thinking about it anymore.

[PROSECUTOR]: We could not agree to it, your Honor.

- 10 -

THE COURT:     Okay.

[DEFENSE COUNSEL]:   I was hoping that he'd say he wouldn't and I wouldn't have to tell you that.

THE COURT:     You said you would not?

[DEFENSE COUNSEL]:   No, we won't.

THE COURT:     You're waiting for [the prosecutor] to - -

[DEFENSE COUNSEL]:   I was hoping he'd say he wouldn't agree and then I wouldn't have to tell you whether I would or not, but I don't see any point in holding back.

THE COURT:     (Court discussing juror problem with the Bailiff off the record).

[DEFENSE COUNSEL]:   Is there somebody else with a medical issue now?

THE COURT:     No, the same one.

[DEFENSE COUNSEL]:   Oh, okay.  That's his problem is his - - okay.

THE COURT:     Over your objection - - [defense counsel], I'm gonna let you lodge an objection - - I'm gonna do it, okay? Okay.  You object to the Court's action? -

[DEFENSE COUNSEL]: Yes, I do.  I do.

THE COURT:     All right.  And I want the record to be clear.  This is based on information that I've received from the Court officer that this witness will have an irreconcilable conflict with tomorrow.  He has a medical issue that has  - - involving his wife, correct?

BAILIFF:   His wife, yes, sir.

THE COURT:     And irrec – and the Court will take partial lumps for this one, but this case cannot finish today under any realistic scenario.  All right.  Rather than draw, based on the information - - let

- 11 -

me see the juror's name. The juror's name is [    ]. Based on the information this Court has received and over the objection of the defendant, I'm going to excuse him from further service in this case, and I'm going to do that now. He will not be brought back in. Go back in and excuse him. Let him leave. The remaining 12 jurors will be brought in, and I will present them with the jury instructions.

[DEFENSE COUNSEL]: Hey, Judge, do you think you should tell them that they'll have to take a break at 12:15? Are you gonna let them start deliberating today?

THE COURT:      I'm gonna let them get organized.

The trial court exercised its discretion and properly dismissed the juror prior to deliberations because the juror had an irreconcilable conflict due to his wife's "medical issue" and was "unable to serve." In accordance with Rule 24, the trial court had the authority to dismiss the juror before making the random drawing. *See* Tenn.R. Crim.P. 24 Advisory Comm'n Cmts (This rule "gives the court the option of using a procedure that eliminates the distinction between regular and alternate jurors;" should "a regular juror become[] unable to serve, the additional juror is combined with the other jurors for all purposes during the trial"). The trial court was only required to perform a random draw under Rule 24 to "reduce the jury to a body of twelve or such other number as the law provides." Tenn. R. Crim. P. 24(f)(2)(A).

Moreover, Defendant has not shown that there was any prejudice by the trial court's discharge of the juror. It is possible that the juror would have been discharged by the random draw, and the same jury would have heard Defendant's case. Also, as pointed out by the trial court, both Defendant and the State had accepted the thirteen jurors without exercising all of their peremptory challenges. Defendant has not shown that the trial court's discharge of the juror affected the outcome of his case. Defendant merely speculates about what could have happened if the juror had not been excused and states that "there was a 12/13ths chance that a jury of different composition would have ended up deliberating and deciding this case, with a verdict that may or may not have been different from the verdict in question in this case." However, this can be said of the entire "single entity" process when a juror is eliminated by the random draw. Defendant is not entitled to relief on this issue.

Next, Defendant argues that the trial court committed "reversible error when it decided to excuse one of the 13 trial jurors based upon unsworn *ex parte* communication between the juror and a bailiff and court officer." We note, as pointed out by the State, that Defendant did not object to the *ex parte* communications, and he also failed to request that the juror be examined in court concerning his reason for being discharged. Defendant asserts that he did not object to the communication because the trial court

- 12 -

"abruptly reversed course and excused the juror on its own motion anyway, the opportunity to object to the unsworn ex parte nature of the communications relied upon was immediately foreclosed." We disagree with Defendant's assertions. Defendant had the opportunity to object to the *ex parte* communication when it was first brought up by the trial court but he failed to do so. Defendant also could have objected to the communication after the trial court announced that the juror would be discharged, and he could have at least requested that the juror be examined in court concerning the communications. We also note that Defendant did not present any proof on this issue at the hearing on his motion for new trial.

> Generally, ex parte communications by the trial court and the jury are subject to reversal "'where a timely complaining party shows specific prejudice, or where, owing to the nature of the ex parte communication, the reviewing court is unable to determine whether the action was actually harmless.'" [ *State v. Tune*, 872 S.W.2d 922, 928 (Tenn. Crim. App. 1993)] (citing *Guy v. Vieth*, 754 S.W.2d 601, 605 (Tenn. 1988)).

*State v. Sparrow*, No. M2012-00532-CCA-R3-CD, 2013 WL 1089098, at *24 (Tenn. Crim. App. Mar. 14, 2013).

In this case, Defendant has not shown that there was any improper *ex parte* communication between the juror and the bailiff and court officer or the trial court. The juror had simply informed the bailiff that he could not be in court the following day because the juror's wife had a medical issue. This communication was had before the jury began deliberations, it involved the juror's welfare and did not involve the specifics of the case, did not contain supplemental instructions relating to the case, nor did it affect the deliberative process in any way. *See Guy v. Vieth*, 754 S.W.2d 601, 605 (Tenn. 1988) (quoting *Truscott v. Chaplin*, 403 F.2d 644, 645 (3rd Cir. 1968). The trial court provided counsel for both parties with the information communicated, and it is apparent that this was done promptly. Defendant has not shown any specific prejudice concerning the communication. Defendant is not entitled to relief on this issue.

## II.     *Election of Offenses (Defendant's Issues III and IV).*

Defendant argues that the trial court "committed reversible error when it refused to require the state to make an election as to which alleged act the state was relying upon for the consideration of the jury in deciding whether [D]efendant was guilty of the indicted offenses or any lesser included offenses." Defendant also argues that the trial court failed to issue a special jury instruction regarding juror unanimity.

Where there is evidence at trial that the defendant has committed multiple offenses during a time period alleged in a single count of an indictment or presentment, the doctrine of election requires the State to elect the facts upon which it is relying to

- 13 -

establish a charged offense. *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). "The election requirement safeguards the defendant's stated constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Id.* at 631 (citing *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999)).

Because the election requirement is "fundamental, immediately touching the constitutional rights of the accused," an election of offenses is mandated whether or not the defendant requests an election. *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Rather, it is incumbent upon the trial court even absent a request from the defendant to ensure that the State properly makes an election in order to avoid a "'patchwork verdict' based on different offenses in evidence." *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993).

No election was required in this case. Tennessee Code Annotated § 39-14-105(b)(1) provides, "In a prosecution for theft of property, . . . the state may charge multiple criminal acts committed against one (1) or more victims as a single count if the criminal acts arise from a common scheme, purpose, intent or enterprise." Furthermore, pursuant to subsection 105(b)(2), "[t]he monetary value of property from multiple criminal acts which are charged in a single count of theft of property shall be aggregated to establish value under this section." This court has stated:

> Where an accused is alleged to have stolen property in separate acts but from the same owner, from the same location, and pursuant to a continuing criminal impulse or a single sustained larcenous scheme, the State is permitted to aggregate the value of the stolen property and prosecute the thefts as a single offense.

*State v. Kathyrn White Byrd,* No. E2002-00417-CCA-R3-CD, 2003 WL 21276499, at *5 (Tenn. Crim. App. May 29, 2003) (citation omitted). "Acts of vandalism are to be valued according to the provisions of § 39-11-106(a)(36) and punished as theft under § 39-14-105." T.C.A. § 39-14-408(c).

In this case, the indictment charged Defendant with one count of theft and one count of vandalism that occurred between the fall of 2011 and January 2012. At trial, the State proved that Defendant knowingly cut and took timber from Mrs. Garner's property without her consent, and he also caused damage to and destroyed her property without her consent between the fall of 2011 and January 2012. Although multiple acts of theft and vandalism may have occurred within the time period listed on the indictments, the acts were against the same owner, from the same location, and were committed pursuant to a "continuing criminal impulse or a single sustained larcenous scheme." *White*, 2003 WL 21276499, at *5. As such, the State was justified in aggregating all of the theft and vandalism allegations into one indictment. *See State v. Cattone*, 968 S.W.2d 277, 279

- 14 -

(Tenn. 1998); *State v. Jacob Dyck*, No. E2001-00476-CCA-R3-CD, 2002 WL 661921, at *3-5 (Tenn. Crim. App. Apr. 22, 2002).

Defendant also contends that the trial court failed to give the jury an instruction regarding juror unanimity. However, only where evidence of unindicted offenses is introduced at trial is it the trial court's duty "to require the State, at the close of its proof-in-chief, to elect the particular offense . . . upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense." *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). The election requirement ensures that "jurors deliberate over and render a verdict based on the same offense." *Brown*, 992 S.W.2d at 391. Since we have determined that the State was not required to make an election in this case, no jury instruction was required regarding juror unanimity.

### III.     *Redacted Indictment (Defendant's Issues V and VI).*

Finally, Defendant argues that the trial court erred by permitting the name of co-defendant Denzil Stephens to be redacted from the indictment as read to the jury prior to trial. He further contends that "permitting the name of the co-defendant to be omitted when the indictment was read to the jury, the effect was the equivalent of the amendment of the indictment." Defendant also argues that the trial court erred in excluding the admission of an unredacted indictment into evidence.

Initially, we address the State's argument that the issue concerning redaction of the indictment is waived because Defendant did not object to Mr. Stephens' name being redacted from the indictment and because Defendant failed to include a copy of a redacted indictment in the appellate record. A defendant has the duty to prepare a record that "convey[s] a fair, accurate and complete account of what transpired" in the trial court." Tenn. R. App. P. 24(a). After the briefs were filed in this case, Defendant filed a motion in this court to supplement the record with the portion of the trial transcript containing Defendant's objection concerning the redaction of the co-defendant's name from the indictment. Defendant also noted the following in his motion:

> The undersigned does not recall that an actual redacted version of the indictment was ever made. Rather, it is the recollection of the undersigned that the name of the codefendant was simply omitted when the indictment was read to the jury. However, if there is a redacted version of the indictment that was not included in the record on appeal in this cause, the record should be supplemented to include the same as well.

The "CERTIFICATE OF APPELLATE RECORD" filed by the court clerk contains the following statement concerning the transcript and redacted indictment:

- 15 -

> The Circuit Court Clerk's Office does not have a redacted indictment in the file of [Defendant]. Circuit Court Clerk[,] Donnie Phillips, has searched the file and the rule docket and it is believed that a redacted indictment was never filed.
>
> The Circuit Court Clerk[,] Donnie Phillips, talked with Barbara Davis on December 3, 2016 in regards to the bench conference, that is referred in the Appellate Court Order, filed on November 28, 2016. Mrs. Davis has no record (microphones may have been turned off) of the bench conference.

The record was supplemented with the hearing on Defendant's motion for new trial. However, there was no transcript of Defendant's objection to the State's reading of the indictment which omitted the co-defendant's name, and there was no redacted indictment that was included in the supplemental record. At the motion for new trial hearing, defense counsel noted that "on the morning of trial, the State announced that it was going to nolle the co-defendant's case, Denzil Stephens, and was permitted to redact his name from the indictment over our objection." We note that allegations contained in pleadings and statements made by counsel during a hearing or the trial are not evidence. Thus, neither can be considered in lieu of a verbatim transcript or statement of the evidence and proceedings. *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). It is the duty of the appellant to have prepared a transcript of the evidence necessary to convey a fair, accurate, and complete account of what transpired in the lower court. Tenn. R.App. P. 24(b). If such a transcript is not available,

> the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 60 days after filing the notice of appeal.

Tenn. R.App. P. 24(c). Defendant did not prepare a statement of the evidence nor did he introduce any evidence at the hearing on his motion for new trial concerning this issue.

The indictment contained in what is generally referred to as the "technical record" in the appellate record does not have the co-defendant's name removed. Thus, there is no indication that the indictment was actually amended. The record in this case is not clear as to exactly when the State requested to omit Denzil Stephens' name from the indictment because the charges against him were nollied by the State. Nor is it clear that Defendant objected or when he objected to this omission of Mr. Stephens' name from the indictment. Prior to the reading of the indictment, the trial court made the following

comments to the jury: "You should have a ring binder notebook somewhere in the proximity of your seat. Inside the notebook you will find – or should find a copy of the indictment that's about to be read to you, paper to write on and a pen or pencil to write with." The indictment was then read to the jury by the Prosecutor without the co-defendant's name. It is unclear from the record whether the notebook given to the jurors had a redacted copy of the indictment or if the State simply omitted the co-defendant's name as the indictment was read. Because the record in this case is incomplete to provide a meaningful review, this issue is waived.

Despite the waiver, we find that the omission of Denzil Stephens' name when the prosecutor read the indictment to the jury is not an amendment as argued by Defendant. Pursuant to the United States Constitution and the Constitution of the State of Tennessee, "an indictment must provide the accused with the 'nature and cause of the accusation' being made against him/her." *State v. Smith*, 492 S.W.3d 224, 239 (Tenn. 2016) (citing U.S. Const. amend. VI; Tenn. Const. art. I, § 9). "An indictment must present facts in such a way that 'enable[s] a person of common understanding to know what is intended.'" *Smith*, 492 S.W.3d at 239; *see* Tenn. Code Ann. § 40-13-202. Our Supreme Court has held that "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991). "[A]n indictment meets statutory and constitutional requirements if it 'achieve[s] the overriding purpose of [providing] notice to the accused.'" *Smith*, 492 S.W.3d at 239 (quoting *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997)). The indictment in this case meets those requirements. We also note that during trial, the jury was told on more than one occasion that Mr. Stephens was also charged as a co-defendant in the case and that the charges against him were dismissed. Defendant is not entitled to relief on this issue.

Finally, Defendant contends that the trial court erred by excluding the unredacted indictment into evidence that contained both Defendant's and Mr. Stephens' names as co-defendants. Generally, the admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse of discretion. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). During Defendant's cross-examination of Mr. Stephens at trial, defense counsel requested that a copy of the original indictment charging both Defendant and Mr. Stephens be admitted as an exhibit. The State objected to the admission of the indictment, and the trial court held: "Without any question, that is - - that's before the Court. I - - making this an exhibit can be confusing to the jury. I will let you make whatever issues you want to make, but I'm not gonna permit it to be an exhibit to the trial of this case." The trial court also gave the following curative instruction to the jury:

> Ladies and gentlemen, the indictment that was read to you earlier and the
> indictment that is part of the case is against, of course, the defendant,

Michael Dean Sexton.  The original indictment had included this witness, Denzil Stephens, as a co-defendant in the case.  You are - - you can take that without contention, there is no question about that.  Is that correct, gentlemen?

Both defense counsel and the prosecutor responded affirmatively.  As previously noted above, it is not clear from the record which indictment was included in the notebooks given to the jurors.  However, the trial court made it clear to the jury that Mr. Stephens was originally listed as a co-defendant in the indictment. Defendant is not entitled to relief on this issue.

## CONCLUSION

The judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE